IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 05-cr-00280-WDM-02

UNITED STATES OF AMERICA,

Plaintiff,

v.

2. SARAH KHONAIZAN,

Defendant.

---

PLEA AGREEMENT AND STATEMENT OF FACTS
RELEVANT TO SENTENCING

---

The United States of America, by William J. Leone, United States Attorney for the District of Colorado, and through Brenda K. Taylor, Assistant United States Attorney, and the defendant, SARAH KHONAIZAN, personally and by counsel Forrest W. Lewis and Jennifer L. Gedde, submit the following Plea Agreement and Statement of Facts Relevant to Sentencing pursuant to D.C. Colo. L. Crim. R. 11.1.

## I. PLEA AGREEMENT

1. The defendant agrees to enter a plea of guilty to Count 3 charging a violation of 8 U.S.C. § 1324 (a)(1)(iii) & (B)(1) and 18 U.S.C. §2, Harboring, Attempting to Harbor, and Aiding and Abetting Harboring an Alien for the purpose of private financial gain, to wit, the receipt of cleaning, cooking, child care, and other domestic labor for little or no



COURT
EXHIBIT
1

PENGAD-Bayonne, N. J.

wages or pay.

2. In exchange for the defendant's plea of guilty to Count 3, the government agrees to dismiss Counts 1, 2 and 4, as to this defendant only, at the time of sentencing.

3. The government further agrees, pursuant to Federal Rule of Criminal Procedure 11 (c)(1) (B), to recommend to the Court that the defendant receive a two-point reduction in the offense level for acceptance of responsibility and that she be sentenced to probation with a condition of home detention.

4. The defendant agrees to removal from the United States under conditions set by the Deportation and Removal section of the Bureau of Immigration and Customs Enforcement (ICE) and at no expense to the United States government. Under no circumstances will the removal of the defendant be beyond thirty days following the completion of any obligations imposed by her sentence in the present case and in *People v. Khonaizan*, Arapahoe County Case No. 05CR1579 and the issuance of an Order of Deportation. The defendant understands that this means that she waives any right to contest or appeal the Order of Deportation. The defendant also understands that she will bear the costs of transportation in connection with the Order of Deportation for herself and any family members who accompany her. The defendant agrees that following the entry of her guilty plea and sentencing in the federal case, the defendant's passport shall be returned to the custody of ICE and shall be maintained by ICE until the defendant leaves the United States.

5. The defendant also agrees to pay full restitution to Sitizulaikah Warsito Alib for the entire period of her employment within the United States, September 10, 2000 through November 18, 2004.

## II. MAXIMUM STATUTORY PENALTIES

The maximum statutory penalty for the offense is: no more than 10 years imprisonment, not more than a $ 250,000 fine, or both; $100 special assessment fee; plus restitution. (There may also be a term of supervised release imposed of not more than 3 years, pursuant to 18 U.S.C. § 3583. A prison sentence may be imposed for violation of the supervised release.) Costs of supervision and/or incarceration may also be imposed. The conviction may also cause loss of civil rights including, but not limited to, the rights to possess firearms and to hold elected office. Since the defendant is an alien, she understands that the conviction will result in her deportation from the United States.

## III. ELEMENTS OF THE OFFENSE OF CONVICTION

Defendant understands that in order to prove her guilt, the government would have to prove beyond a reasonable doubt the following elements of the offense. Defendant understands that, by her guilty plea, she is admitting that she committed the following acts:

1. Between on or about April, 2001, in the State and District of Colorado;

2. Knowing or in reckless disregard of the fact that an alien, Sitizulaikah Warsito Alib, remained in the United States in violation of law;

3. Did harbor, attempt to harbor, and aid and abet the harboring of Sitizulaikah Warsito Alib;

4. For the purpose of private financial gain, to wit, the receipt of cleaning, cooking, child care, and other domestic labor for little or no wages or pay.

## IV. STIPULATION OF FACTUAL BASIS AND FACTS RELEVANT TO SENTENCING

The parties agree that there is no dispute as to the material elements which establish a factual basis for the offense of conviction.

Pertinent facts are set out below in order to provide a factual basis for the plea and to provide facts which the parties believe are relevant, pursuant to § 1B1.3, for computing the appropriate advisory guideline range. To the extent the parties disagree about the facts relevant to sentencing, the statement of facts identifies which facts are known to be in dispute at the time of the plea. (§ 6B1.4(b))

The statement of facts herein does not preclude either party from presenting and arguing, for sentencing purposes, additional facts or factors not included herein which are relevant to the guideline computation (1B1.3) or to sentencing in general (1B1.4). Nor is the court precluded from the consideration of such facts. In "determining the factual basis for the sentence, the court will consider the stipulation [of the parties], the pre-sentence investigation report, and any other relevant information." (§ 6B1.4 Comm.)

The parties agree that the government's evidence would show that the date on which conduct relevant to the offense (§ 1B1.3) began is September 10, 2000.

The parties agree that the government's evidence would be:

1. On November 18, 2004, federal search warrants 04-5213M, 5214M and 5215M were obtained, and a search was conducted of 2035 South Joliet Court, Aurora, Colorado, the residence of Sarah Khonaizan (hereafter "Khonaizan") and her husband Homaidan Al-Turki (hereafter "Al-Turki"), for evidence of a violation of Title 8, U.S.C. §1324, harboring illegal aliens. Sitizulaikah Warsito Alib (hereafter "Alib"), an Indonesian citizen, was discovered living in the residence. Alib's Indonesian passport, which had expired on December 18, 2001, and which contained a United States visa which had expired on March 9, 2001, was found in Khonaizan's and Al-Turki's upstairs bedroom closet inside a briefcase, along with the passports of all of the members of the Al-Turki family.

2. During the execution of the search warrant, ICE Special Agent Michael Riebau questioned Khonaizan through an Arabic interpreter as to why Alib was found in Khonaizan's home with an expired visa. Khonaizan stated that her husband (Al-Turki) was responsible for Alib and her visa, and that he did nothing to extend Alib's stay when Alib's visa expired. Khonaizan also told the interpreter, "I told my husband this would cause us problems."

3. Alib has provided the following information concerning how she came to the United States and her immigration status:

**a.** In mid-1999, at age 17, while residing with her mother, father, and younger sister

in Indonesia, she applied with an Indonesian employment agency to become a domestic employee.

**b.** A few weeks later, Alib was informed that she was sponsored to go to Saudi Arabia for employment as a domestic worker for a Saudi family.

**c.** In June of 1999, Alib took her first airplane trip, traveling from Indonesia to Saudi Arabia. She met Khonaizan and her children for the first time in the Riyadh, Saudi Arabia airport. Khonaizan, speaking in Arabic, directed Alib to change into a black robe and veil covering her entire face before they left the airport. Al-Turki, Khonaizan's husband and a Saudi Arabian citizen, was residing in the United States at that time as a student.

**d.** Alib worked in Saudi Arabia for Khonaizan as a maid/housekeeper for an extended family of fifteen people and as a childcare provider for five children.

**e.** It was Saudi Arabian custom, and the custom of the Al-Turki household, that Alib remain covered and remain inside the Al-Turki house.

**f.** It was Alib's understanding that she was to be paid 600 riyals per month for her services, and she was paid 1800 riyals by Khonaizan at the end of the first three months of her employment in Saudi Arabia.

**g.** After three months, Khonaizan went to the United States to join Al-Turki. She told Alib that she eventually wanted Alib to come to the United States and continue to work there as a domestic servant for Khonaizan and Al-Turki, but that the Saudi

government required Alib to remain in Saudi Arabia for one year.

**h.** Alib remained in Saudi Arabia working as a domestic servant for Khonaizan's relatives until September 2000 when Khonaizan returned and asked Alib if she wanted to go to the United States. Alib agreed. Alib was owed 6000 riyals by Khonaizan's relatives when she left Saudi Arabia. Khonaizan's relatives told her they would put the money in their bank for Alib for safekeeping in case there were robbers on the airplane. Alib never received this money despite repeated requests to Khonaizan and repeated promises by Khonaizan to pay her.

**i.** Alib would testify that prior to their departure, Khonaizan took Alib to a government office in Riyadh to arrange for Alib to come to the United States. Alib would also testify that Khonaizan told Alib that she would really be paid 600 riyals per month in the U.S. but to tell the people in the government office that she was going to be paid $800 per month.

**j.** Alib traveled with Khonaizan and Khonaizan's children to the United States via London. Al-Turki met the family in London and they all flew together to Denver, Colorado.

**k.** Upon arrival in the United States, Al-Turki controlled the passports and immigration documents of Khonaizan, their children, and Alib during their inspection by U.S. government officials and entry into the United States. Alib had no contact with U.S. government officials at that time.

l. Alib has not had possession of her passport since she first arrived in Saudi Arabia in 1999. She stated that Al-Turki and Khonaizan have also held her passport since her arrival in the United States.

4. ICE databases and Treasury Enforcement Communication Systems records confirm that Alib traveled from Saudi Arabia to Denver, Colorado on September 10, 2000 and entered the United States pursuant to a Visitor for Business (B-1) non-immigration visa. These records also confirm that Alib and Khonaizan were on the same flight from Saudi Arabia to Denver, Colorado, and were inspected by the same immigration inspector at Denver International Airport. The inspection date stamp on Al-Turki's passport also confirms that Al-Turki did in fact arrive in the United States on the same date as Khonaizan and Alib, and was processed by the same United States Customs inspector.

5. Forms I-94 maintained by ICE from September 10, 2000 when Alib and Khonaizan arrived in the United States indicate that the destination of Khonaizan and Alib in the United States was 16016 East Lehigh Circle, Aurora, Colorado, the residence of Khonaizan and Al-Turki at that time.

6. According to Department of State non-immigration visa application documentation, a Visitor for Business Visa (B-1) was issued in Riyadh, Saudi Arabia on August 22, 2000 in Alib's name for the express purpose of working as a domestic employee for the Homaidan Al-Turki family in the United States. ICE form I-94 for Alib shows that this visa expired on March 9, 2001.

7. Alib told federal agents that she knew Khonaizan and Al-Turki were aware that her visa had expired, because she had talked to them about it. On several occasions, Alib asked Khonaizan about it, and Khonaizan told Alib that Al-Turki was going to update her visa.

8. Alib would testify that in October of 2004, Khonaizan told Alib that a family friend, Khaled Resheid, had been contacted by government officials and that Resheid had told the officials Alib was working as a servant for the Al-Turki family.

9. Alib would also testify that, also in October of 2004, Khonaizan told Alib that law enforcement/government officials may ask her about her passport and she should tell the law enforcement/government officials that she and Al-Turki are working on getting her passport updated.

10. Records of any applications for extension of stay in the United States by an alien are maintained in the United States Citizenship and Immigration Services database, known as "CLAIMS". A review of that database reflects no record of any application for extension of stay in the United States in the name of Sitizulaikah Warsito Alib or Sitizulaikah Warsito Alig (her name appears incorrectly as "Alig" in some documents).

11. Alib would also testify that she asked Khonaizan on a few occasions if she could quit working and return to Indonesia, and that Khonaizan told Alib that there were problems with Alib's passport, and that this would cause problems with U.S. law enforcement if she tried to leave.

12. From 1999 through 2004, Alib was paid as follows:

a) **1999**: $1800 riyals (approximately $481 U.S. dollars) for the first three months in Saudi Arabia at a rate of 600 riyals (approximately $160) per month. She sent this money to her family in Indonesia;

b) **Spring of 2003**: $1,000 U.S. dollars which was wire transferred to her family;

c) **August of 2004**: $500 cash paid to her by Khonaizan. Alib used some of this money to buy clothing and gifts for her family in Indonesia;

d) **Total compensation and payments received in U.S. :** From September of 2000 to November of 2004, Alib was compensated only $3,300.00 U.S. dollars, which equates to approximately $57.29 per month or approximately $1.91 per day.

13. Alib would testify that she asked Al-Turki on multiple occasions about receiving her wages to send home to Indonesia. At first, Al-Turki told Alib that he had sent money to her family; later, he acknowledged that he had not.

14. Alib's family in Indonesia was contacted on December 7, 2004 by telephone regarding what monies they have received for Alib's work for the Khonaizan/ Al-Turki family. Alib's father confirmed that he received money from Al-Turki only once between 2000 and 2004, after Alib went to the United States--$1,000 in the spring of 2003.

15. Alib would testify that in October of 2004, Khonaizan told Alib that if anyone

should ask, she should say that she was being paid $800 per month and that she had two days off each week.

16. When Khonaizan and the children were out of town, Al-Turki and Khonaizan arranged for Alib to stay with four different families for various periods of time ranging from one week to approximately six weeks. She stayed with and performed domestic labor for Khaled Resheid in Aurora, Colorado, Abdulrahman Al-Homoud in Kansas, Zulfikhar Ali-Mohammed in Flat Irons, Colorado, and Saud Nagadan in Aurora, Colorado. She was never paid by Al-Turki, Khonaizan, or any of these other host families for her work.

17. Khaled Resheid was interviewed in November 2004 by federal agents. He stated that he had been aware for over two years at the time of the interview that Alib's visa had expired and that she was illegally residing with Al-Turki and Khonaizan in the United States. According to Resheid, the source of his information was Al-Turki.

18. Resheid also stated that in mid 2003, Al-Turki and Khonaizan arranged for Alib to stay at Resheid's residence, located at 1905 South Macon Way, Aurora, Colorado, for several weeks. Resheid stated Al-Turki told him Alib was not to go places unaccompanied, because she is illegal and may run away.

## V. <u>SENTENCING COMPUTATION</u>

The parties provide the following estimate of the advisory guideline range. The parties understand that the Court may impose any sentence up to the statutory maximum,

regardless of any guideline range computed, and that the Court is not bound by any position of the parties. (§6B 1.4(d)) The Court is free, pursuant to §§6A1.3 and 6B1.4, to reach its own findings of facts and sentencing factors considering the parties' stipulations, and other relevant information. (§6 B1.4 Comm.; §1B1.4).and Title 18, United States Code, Section 3553).

To the extent the parties disagree about the sentencing factors, the computations below identify the factors which are in dispute. (§ 6B1.4(b)) New facts which arise or are discovered may cause a party to change its position with regard to guideline computation or sentencing position. The parties' estimated guideline computation is:

**Guideline Computation**

A. The base guideline is §2L1.1(a) (2), with a **base offense level of 12**.

B. It is the government's position that no specific offense characteristics apply. The defendant contends that 2L1.1 (b) (1) (A) applies, which provides for a 3 level decrease in the offense level if the offense was committed other than for profit. The government disagrees. The issue to be determined at time of sentencing is the meaning of "profit" in 2L1.1(b) (1) (A).

C. There are no role-in offense adjustments.

D. The defendant is not subject to an enhanced sentence as a career criminal.

E. The defendant should receive a **2 point adjustment** for acceptance of responsibility pursuant to §3E1.1(a). The resulting offense level would therefore be **10**.

If the Court applies the Specific Offense Characteristic at 2L1.1(b)(1)(A), the resulting offense level would be **7**.

F. The parties understand that the defendant's criminal history computation is tentative. The criminal history category is determined by the Court. At this time it is believed that the defendant has no prior convictions and her **criminal history category (CHC) would be I.** The parties agree that any sentence imposed upon Ms. Khonaizan in the case of *People v. Khonaizan*, Arapahoe County Case No. 05CR1579, would be for conduct which is "part of the instant offense," as that phrase is used in §4A1.2(a)(1). Any such sentence would therefore not cause an increase in Ms. Khonaizan's criminal history category.

H. The guideline range resulting from the estimated offense level of **10** above, and the (tentative) criminal history category of **I** above, is **6-12 months**. The guideline range resulting from the estimated offense level of **7** above, and the (tentative) criminal history category of **I**, above, is **0-6** months.

The parties agree that, depending upon the determination of the applicable guideline range by the Court, Ms. Khonaizan should be sentenced to probation pursuant to §5B1.1(a), either with no sentence of imprisonment pursuant to §5C1.1(b), or with a condition or combination of conditions that substitute home detention for imprisonment according to the schedule in subsection §5C1.1(e)(3), pursuant to §5C1.1(c)(3).

The sentence would be limited, in any case, by the statutory maximum.

Pursuant to guideline § 5E1.2, assuming the estimated offense level of **10** above, the **fine range** for this offense is **$2,000 to $20,000**, plus applicable interest and penalties. Pursuant to guideline § 5E1.2, assuming the estimated offense level of **7** above, the **fine range** for this offense is **$500 to $5,000**, plus applicable interest and penalties.

Pursuant to §5D1.2, if the Court imposes a term of **supervised release**, that term shall be at least **2** years but not more than **3** years.

## VI. APPROPRIATENESS OF PLEA AGREEMENT

The parties believe that the proposed plea agreement is appropriate because all relevant conduct is disclosed, the sentencing guidelines take into account all pertinent sentencing factors with respect to the defendant, and the charge to which the defendant has agreed to plead guilty adequately reflects the seriousness of the actual offense behavior.

This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings or assurances, express or implied. In entering this agreement, neither the government nor the defendant have relied, or are relying, on any terms, promises, conditions or assurances not expressly stated in this agreement.

Date 5-9-06

SARAH KHONAIZAN
Defendant

Date 5-9-06 ______________________________

**FORREST W. LEWIS**
**JENNIFER L. GEDDE**
Attorneys for Defendant Sarah Khonaizan

Date 5-9-06 Brenda K. Taylor

**BRENDA K. TAYLOR**
Assistant U. S. Attorney